# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | |
| Plaintiff, | No. CR 09-1164-TUC-DCB (CRP) |
| vs. | REPORT AND RECOMMENDATION |
| JAIME MARTINEZ-GARCIA, | |
| Defendant. | |

Defendant brings a Motion to Suppress Statement and Confession before this Court, arguing this Court should suppress (1) his statements to Border Patrol Agent Amarillas because he was not *Mirandized* and the statements were otherwise involuntary, and (2) his statements and signed confession to FBI Agent Terwilliger and Border Patrol Agent Gonzalez because these statements and confession were involuntary. (Doc. 41) The Government presents no opposition to the first argument but opposes suppressing the signed statement. (Doc. 47). Magistrate Judge Pyle conducted an evidentiary hearing on this motion on Thursday, June 24, 2010. (Doc. 58). For the reasons discussed within, the Magistrate Judge recommends that the District Judge, after his independent review, DENY the Motion to Suppress.

## I. **EVIDENTIARY HEARING**

The Magistrate Judge held an evidentiary hearing on this motion on Thursday, June 24, 2010. (Doc. 58). The record contains the transcript of this proceeding. (Doc. 63). During the hearing, the Government introduced two witnesses in support of its position:

1. Border Patrol Agent Gilberto Gonzalez, currently a member of the critical incident team and a Border Patrol agent for nine years.

2. Special Agent Michelle Terwilliger of the Federal Bureau of Investigation ("FBI"), with six-and-a-half years experience.

Defendant introduced nine witnesses in support of his position:

1. Dr. Peter Rhee, the Chief of Trauma Acute Care Surgery at University Medical Center, and a former Navy Captain with over 24 years of experience in trauma surgery.

2. Sergeant Chad Matthews of the Santa Cruz County Sheriff's Office, assigned to the patrol division.

3. Deputy Sheriff Pedro Felix of the Santa Cruz County Sheriff's Office, assigned to the patrol division.

4. Registered Nurse Julie Sherman, with a four-year degree in nursing from Oregon Health & Science University, and a masters degree in nursing from the University of Arizona, a bedside nurse for seventeen years.

5. Registered Nurse Naomi Niemeyer, employed by University Medical Center.

6. Registered Nurse Erica Sanchez, with three to four years experience, employed by University Medical Center.

7. Border Patrol Agent Jessie Moore, a member of the critical incident team with twelve years experience.

8. Border Patrol Agent Crystal Amarillas, with two years experience.

9. Supervisory Assistant Federal Public Defender Victoria Brambl, who appeared at Defendant's initial appearance before District Judge Ferraro on May 26, 2009.

## II. FACTUAL FINDINGS

At approximately 5:00 A.M. on May 23, 2009, Sergeant Matthews of the Santa Cruz County Sheriff's Office responded to an incident between Border Patrol and Defendant involving gunfire. (TR 6/24/10, p. 47). Sergeant Matthews observed Defendant lying on the ground with gunshot wounds, not wanting to speak. (*Id.*). Shortly after Sergeant Matthews arrived, a helicopter airlifted Defendant to University Medical Center ("UMC"). (*Id.* at 49).

Upon his arrival at the hospital, Dr. Rhee treated Defendant for seven gunshot wounds. (TR 6/24/10, p. 9). Dr. Rhee stated that the wounds could be consistent with three actual shots fired: two entry/exit wounds in the leg, and one entry/exit wound in the arm and a final entry wound in the chest. (*Id.* at 9-10). Dr. Rhee treated the wounds and removed the bullet in Defendant's chest. (*Id.* at 10).

Over the next thirty-six hours Defendant received numerous treatments for pain related to the shooting and surgery. (Medical Record dated 5/23/09, Ex. 10). On May 23, Defendant received morphine injections at 3:30 P.M., 9:50 P.M., and 11:50 P.M. (*Id.*). On May 24, Defendant received morphine injections at 4:15 A.M. and 7:30 A.M. (*Id.*). He also received percocet tablets at 7:30 A.M., 11:00 A.M., and 3:10 P.M. on the same day. (Medical Record dated 5/24/09, Ex. 11). On May 23, while Defendant recovered from surgery and his wounds in his hospital bed, Border Patrol Agent Crystal Amarillas stood nearby to guard him. (TR 6/24/10, p. 115). She stood there from approximately 6:30 A.M. to 1:00 P.M. (*Id.*). She did not "ask [Defendant] any questions." (*Id.* at 116). Between 10 and 11 A.M. that day, Defendant spontaneously began talking to Agent Amarillas, at first by mumbling. (*Id.* at 118, 120). According to Agent Amarillas, Defendant then started "speaking out" and stated "the agent told [me] to stop and that he started to shoot at [me] once [I] ran up the ridge, the agent shot [me]. After the agent shot [me], [I] threw rocks at the agent." (*Id.*).

The following day, sometime shortly after his last dose of percocet around 3 P.M., Defendant was discharged. (TR 6/24/10, p. 70). Nurse Julie Sherman testified on cross-

examination that before the hospital discharges a patient, the patient must be:

> alert and oriented times four, which means you're awake, you know who you are, you know why you're here, you know where you are, you know the date and the time. You're interactive with [the nurse], you can feed yourself, you can use the bathroom, you are ambulatory, and your pain is controlled. When you cover all those things, there's no reason to be in the hospital.

(*Id.* at 68). Defendant's percocet prescription was entered as "Q4 hours as needed," meaning that Defendant could take the pain medication every four hours, if he felt he needed it. (*Id.* at 70).

At approximately 6:00 P.M. on May 24, Border Patrol Agent Gilberto Gonzalez and FBI Agent Michelle Terwilliger began interrogating Defendant at the border patrol station. (TR 6/24/ 10, pp. 20-22). Agent Gonzalez served as an interpreter for Agent Terwilliger. (*Id.* at 30). Agent Gonzalez is not a certified translator, (*Id.* at 32), but he is fluent in Spanish, (*Id.* at 22). Agent Terwilliger speaks no Spanish and had "no clue" what was the actual substance of the conversation between Agent Gonzalez and Defendant. (*Id.* at p. 95). Agent Terwilliger decided not to record the interrogation in any way, per FBI policy. (*Id.* at 35).

Before the interrogation, Agent Gonzalez presented Defendant with a Border Patrol form advising him of his *Miranda* rights in Spanish and also read the form out loud to Defendant. (*Id.* at 24). Defendant signed the form indicating that he understood his rights and also waived those rights on the same form. (Ex. 5). Defendant also signed an English-language FBI form waiving his *Miranda* rights, which Agent Gonzalez translated. (*Id.* at 36). Agent Gonzalez proceeded to ask Defendant questions about his immigration status and translated for Agent Terwilliger along the way. (*Id.* at 28-29). According to Agent Gonzalez, Defendant did not appear to have difficulty understanding or answering the questions, nor did he appear sleepy or groggy. (*Id.* at 28). Agent Terwilliger also testified that Defendant "seemed fine" and did not appear to be in obvious pain and that the questions and answers flowed back and forth normally. (*Id.* at

83-84). Both agents testified that Defendant never left the interrogation room to use a restroom. (*Id.* at 43, 98).

Agent Terwilliger's questions centered on the events surrounding the stop and the shooting. (TR 6/24/10, pp. 87-88). Defendant initially stated that "[h]e fell into the kneeling position as he was running up the hill. The border patrol agent then shot him in the chest. He was trying to stop sliding down the hill and may have pushed rocks toward the agent as he slid down the hill." (*Id.* at 39). Agent Terwilliger testified that Defendant's story "kept changing," until she told Defendant that she had a video of the incident and asked him if his story would match up with what was on the video. (*Id.* at 89). She reminded Defendant that it is a crime to lie to a federal agent. (*Id.* at 90). According to Agent Terwilliger, at this point Defendant settled on the final version of his story. (*Id.*). At approximately 7:00 P.M., Defendant signed a statement written in English that states:

> On 05/23/2009, I, JAIME MARTINEZ-GARCIA, was shot in the chest after I threw a rock at the Border Patrol Agent. I was not shot by the Border Patrol Agent until I threw the rock at him. I then threw another rock at the Border Patrol Agent as I was shot multiple times.

(Ex. 6; TR 6/24/10, p. 92).

The record contains no information regarding Defendant's status following his interrogation, or any information about Defendant on the following day, Monday, May 25, 2009. Defendant was not taken for an initial appearance until Tuesday, May 26, 2009. (TR 6/24/10, p. 124). The Government offers no explanation for this delay. (*Id.* at 131). Once Defendant was finally in court, he was not able to participate in the proceedings. (TR 5/26/09, Ex. 15, pp. 2-3). Defendant did not appear conscious in court. (*Id.* at 3). Magistrate Judge Ferraro referred him for medical treatment. (*Id.*). The next day, May 27, 2009, Defendant was able to proceed with his initial appearance, once again appearing before Magistrate Judge Ferraro. (Ex. 14). Judge Ferraro noted that Defendant looked "a lot better today than yesterday" and stated that "[h]e wasn't hardly conscious

1  yesterday." (*Id.* at 7).

## III. ANALYSIS

Defendant argues that his statements and confession should be suppressed because he did not waive his *Miranda* rights voluntarily, and his statement and confession were not voluntary. The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. To protect this right, the Supreme Court requires that prior to any custodial interrogation, a person must be informed of his right to remain silent, that his statements may be used against him, and that he has the right to the presence of an attorney. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These heightened procedural safeguards are meant to balance the "compulsion inherent in custodial surroundings." *Id.* at 458. Custodial interrogation has two requisite parts: both custody and interrogation. *Id.* at 444. When both custody and interrogation are not present, it is not necessary to warn individuals of their rights because "[i]n such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." *Id.* at 478.

An individual can waive *Miranda* rights so long as he does so "voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444. The inquiry into whether an individual waived his rights has two distinct dimensions. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). First, the relinquishment of the right "must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, it must also be voluntary in the sense that "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* However, a waiver of rights does not immediately render a statement or confession voluntary. Courts must determine if the "totality of the circumstances surrounding the interrogation" demonstrate that the individual's statement was made as the product of an uncoerced choice and with the "requisite level of comprehension," in order to conclude a defendant's statements were voluntary. *Id.*

An involuntary waiver may occur when it is "extracted by any sort of threats of violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *United States v. Bautista-Avila*, 6 F.3d 1360, 1364 (9th Cir. 1993) (quoting *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988)).

Determining the severity a defendant's intoxication is imperative to evaluating voluntariness. "[A] confession made in a drug or alcohol induced state, or one that is the product of physical or psychological pressure, may be deemed voluntary if it remains the product of a rational intellect and a free will." *United States v. Banks*, 282 F.3d 699, 706 (9th Cir. 2002), *reversed on other grounds*, *United States v. Banks*, 540 U.S. 31 (2003). A simple showing that a defendant received pain killers and narcotics is not enough to render his waiver involuntary. *United States v. Cristobal*, 293 F.3d 134, 141 (9th Cir. 2002). Neither are the combination of pain and narcotics when the narcotics are not received in excessive quantities. *United States v. Martin*, 781 F.2d 671, 674 (9th Cir. 1985). To determine whether a person is too intoxicated to make a voluntary statement or waiver, courts look to the surrounding circumstances, including whether a defendant's speech was slurred, whether a defendant asked for questions to be repeated, asked to leave the room for food, water or a restroom. *See United States v. Doe*, 155 F.3d 1070, 1075 (9th Cir. 1998). The government has the burden of establishing a waiver of *Miranda* rights by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

**1. Statements to Agent Amarillas while recovering in hospital**.

An effective waiver of *Miranda* rights is only necessary during a custodial interrogation. The statement Defendant made to Agent Amarillas was not part of an interrogation. Defendant made this statement from his hospital bed while Agent Amarillas was standing guard in the room. Agent Amarillas testified that she did not ask Defendant any questions before he began speaking to her. Defendant's statement was not made in response to any question asked by Agent Amarillas; it was an unsolicited

statement. Agent Amarillas was not interrogating Defendant. Nothing in the record indicates otherwise. Although Defendant was "in custody" when he made the statement to Agent Amarillas, the heightened procedural protections required by *Miranda* only apply when a defendant is also being interrogated. There is no evidence to support a conclusion that Agent Amarillas was interrogating Defendant. As such, this Court concludes the statements to Agent Amarillas did not implicate *Miranda* and therefore a *Miranda* waiver was unnecessary. The Government does not oppose the suppression of this evidence, but there does not appear to be legal and factual support for its suppression. Therefore, this Court recommends the motion to suppress the statements to Agent Amarillas be denied.

**2. Statements and Confession Made to Agents Gonzalez and Terwilliger**.

Defendant contends statements he made and the confession he ultimately signed during the interrogation by Agents Gonzalez and Terwilliger were not voluntary. Respondents do not dispute this was a custodial interrogation and therefore, *Miranda* applies. Critical to determining whether or not Defendant voluntarily waived his *Miranda* rights and signed a confession during the interrogation is an evaluation of whether or not he possessed the "requisite level of comprehension." *Moran*, 475 U.S. at 421. Defendant argues that he was either in so much pain or so heavily medicated that he could not voluntarily waive his rights or sign a confession. Based on the evidence presented in this case, it is difficult for this Court to ascertain Defendant's condition at the time of the interrogation. The interrogation was not recorded, so the Court is left with two vastly different descriptions of Defendant's condition over a three day period of time.

On the one hand, Nurse Sherman testified that Defendant would not have been released from the hospital had he not been "alert and oriented" and able to interact with her. Allegedly, around 3:00 P.M. on the day of his interrogation, he fit that description and was discharged. Three hours later he signed two waivers of his *Miranda* rights, and four hours later he signed a statement stipulating to, essentially, the Government's version of the events. Both agents involved in the interrogation testified at the evidentiary

hearing that Defendant was alert and coherent. Agent Gonzalez testified that Defendant did not appear to have difficulty understanding or answering questions, nor did he appear sleepy or groggy. Agent Terwilliger testified that Defendant "seemed fine" and did not appear to be in obvious pain and that questions and answers flowed back and forth normally.

Yet, on the other hand, Defendant received large quantities of pain medication in the day and a half leading up to his interrogation, including morphine and percocet. After undergoing surgery for seven gunshot wounds, Defendant received morphine injections on May 23, 2009, at 3:30 P.M., 9:50 P.M., and 11:50 P.M. The following day, the same day as the interrogation, Defendant received morphine injections at 4:15 A.M., and 7:30 A.M. as well as percocet tablets at 7:30 A.M., 11:00 A.M., and 3:10 P.M. Thus, Defendant received his last pain narcotic less than three hours before the interrogation with Agent Gonzalez and Agent Terwilliger began. Further disconcerting to this Court, although Defendant's interrogation finished in the evening of May 24, 2009, the Government offers no explanation for failing to bring Defendant to an initial appearance before the Court on the following day, May 25, 2009. Then, when Defendant was brought to initials on May 26, 2009, the Magistrate Judge referred him to medical treatment because he appeared to be hardly conscious.

Under the totality of the circumstances and the evidence presented during the evidentiary hearing, the Court cannot say that Defendant was in so much pain or so heavily medicated as to render him unable to make a voluntary, knowing, intelligent waiver of his rights. Although Defendant received significant amounts of pain medication in the thirty-six hours leading up to his interrogation, the evidence closest in time to Defendant's interrogation describes him as "alert and oriented." The agents who interrogated him did not notice any signs of sleepiness, grogginess, or difficulty responding to or understanding the questions. Defendant did not ask to leave the room or use a restroom. Although there is a record of pain medication along with Defendant's gunshot wounds, the Court received no testimony from Defendant to contradict the

evidence presented that described him as alert and oriented at the time of the interrogation. He offered no direct evidence that he was over-medicated, under-medicated, or in extreme pain *during* his interrogation, the critical moment in time for voluntariness analysis. Further, the record does not show that Defendant was subjected to coercive law enforcement tactics, that he received threats of violence from Agents Gonzalez and Terwilliger, or that his waiver and confession were the product of deceit.

This Court therefore finds the Government has shown by a preponderance of the evidence that Defendant voluntarily, knowingly, and intelligently waived his right to remain silent and that his statements and signed confession were voluntary. This Court recommends that the motion to suppress the statement to Agents Gonzalez and Terwilliger and his signed confession be denied.

The Court notes, however, that the Government continues to place this Court in the difficult position of discerning reality from little more than bald assertions. The FBI's refusal to record interrogations complicates would could be a straight-forward analysis of voluntariness. Had the FBI chosen to record this interrogation, it would be easy to determine Defendant's condition during the interrogation, whether he understood his rights, and whether he waived them voluntarily, knowingly, and intelligently. A video recording would have shown Defendant's posture, whether he was responding to questions, whether he fell asleep during questioning, whether his speech was slurred, if he exhibited any other signs of intoxication due to the pain medication, appeared to be in significant pain, requested food or requested to leave the room. Instead the Court must piece together circumstantial evidence of Defendant's condition with the testimony of agents whose credibility is unnecessarily drawn into question because they have chosen to forgo a simple, efficient way of corroborating their version of the story. As the Supreme Court noted in *Miranda*, "Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms." 384 U.S. at 448.

The advantages to recording interrogations are clear. Law enforcement officers could easily prove any falsity of alleged use of improper tactics. If government agents

abused a defendant's rights, those abuses would be readily provable, thus discouraging such abuses. Government lawyers could review video or audio recordings to strengthen their prosecutions. Judges and juries would be presented with voluntariness disputes less frequently. And, law enforcement agents would not be placed in the difficult situation where the unverifiable nature of the facts and the pressure to obtain a conviction frames the testimony they are required to give.

As technology becomes cheaper, the choice to forgo recording interrogations to develop a full and complete factual record becomes more inexcusable. It is unfortunate that the Justice Department and the FBI continue to prohibit agents from recording statements in most instances.

Nonetheless, here this Court concludes that Defendant's waiver and signed confession were voluntary.

## IV.  RECOMMENDATION

For the reasons outlined above, the Magistrate Judge recommends that the District Judge, after his independent review and analysis, DENY Defendant's Motion to Suppress Statement and Confession. (Doc. 41).

Given the upcoming trial date of August 24, 2010, the parties must file any objections within seven (7) days of being served with a copy of the Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CR 09-1164-TUC-DCB**.

DATED this 27th day of July, 2010.

_____
CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE